UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:20-CV-00282-RSE

**TONYA R. QUINN**                                                                                     **PLAINTIFF**

VS.

**KILOLO KIJAKAZI,**
*Acting Commissioner of Social Security*[1]                                                **DEFENDANT**

**MEMORANDUM OPINION
AND ORDER**

The Commissioner of Social Security denied Tonya R. Quinn's applications for disability insurance benefits and supplemental security income benefits. Quinn seeks judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). Both Quinn (DN 21) and the Commissioner (DN 27) have filed a Fact and Law Summary. The parties have consented, under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, to the undersigned United States Magistrate Judge conducting all further proceedings in this case, including issuance of a memorandum opinion and entry of judgment, with direct review by the Sixth Circuit Court of Appeals in the event an appeal is filed. (DN 17).

I. Background

Tonya R. Quinn is in her mid-forties, has her GED, and previously worked as a childcare attendant, teacher aid, and home attendant. Quinn was fired from her job in 2016 because she couldn't make it to work consistently due to her mental and physical issues. (Tr. 39). The stress Quinn experienced after losing her job and losing her home resulted in an inpatient hospitalization for five days in February of 2017. (Tr. 45). Her home was invaded in January of 2018, which she

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rule of Civil Procedure 25(d), Kilolo Kijakazi is substituted for Andrew Saul as Defendant in this case.

alleges resulted in post-traumatic stress disorder.

She states that she has an equal number of good and bad days each week. (Tr. 40). On bad days, she can't shower or get dressed and basically can only lay and watch TV. (*Id.*). On good days, she gets dressed, takes her dog to the park or on a 15-minute walk, visits her best friend, watches movies, and listens to music. (Tr. 46-47). Pain in her knees and back and numbness in her hands and feet prevents her from grocery shopping, from bending down, from gripping jars, and from zipping and unzipping clothing. (Tr. 36-37). She states that throughout the day she elevates her legs off and on at a ninety-degree angle because of her neuropathy. (Tr. 48-49). She has a service dog, Kincaid, whose certification has expired. (Tr. 42). Kincaid calms Quinn's anxiety and PTSD, and Quinn estimates she is with him 90% of the time. (Tr. 47-48). About twice a month, when she's feeling extremely fatigued, she passes out without warning. (Tr. 50-51).

Quinn applied for disability insurance benefits ("DIB") under Title II and supplemental security income benefits ("SSI") under Title XVI in July of 2017, claiming she became disabled on October 30, 2016 (Tr. 221-226), as a result of diabetes mellitus, chronic pain, lower back pain, neuropathy peripheral, PTSD, sleep apnea, bipolar depression, arthritis, and torn rotator cuff. (Tr. 262). Her applications were denied initially (Tr. 100-01) and again on reconsideration (Tr. 102-03). Administrative Law Judge D. Lyndell Pickett ("ALJ Pickett") conducted a hearing in Louisville, Kentucky, on February 14, 2019. (Tr. 29-31). Quinn attended the hearing in person with her representative. (*Id.*). An impartial vocational expert also testified at the hearing. (*Id.*). ALJ Pickett issued an unfavorable decision on April 12, 2019. (Tr. 22).

ALJ Pickett applied the traditional five-step sequential analysis promulgated by the Commissioner, 20 C.F.R. § 404.1520, *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 855 (6th Cir. 2010), and found as follows. First, Quinn has not engaged in substantial gainful activity since

October 30, 2016. (Tr. 14). Second, Quinn has the severe impairments of obesity, degenerative disc disease, degenerative joint disease, carpal tunnel syndrome, diabetes mellitus, depression, and anxiety. (*Id.*). Third, none of Quinn's impairments or combination of impairments meets or medically equals the severity of a listed impairment from 20 C.F.R. Pt. 404, Subpt. P, App'x 1. (Tr. 14-15). Between the third and fourth steps, ALJ Pickett found Quinn has the residual functional capacity to perform sedentary work with the following limitations:

> She requires an option allowing her to sit for 30 minutes, stand for 5 minutes, and alternate on that basis throughout the day. She may occasionally balance, stoop, kneel, crouch, crawl, and climb ramps/stairs, but she may never climb ladders/ropes/scaffolds. She may only frequently reach overhead with the right arm and frequently handle, finger, and feel, bilaterally. She can tolerate occasional exposure to vibrations and no exposure to hazards. Due to her mental impairments, she can understand, remember, and carry out simple instructions, deal with changes in a routine work setting, and respond appropriately to occasional interaction with supervisors/coworkers in usual work situations. She may not work with the public and her work must not expose her to noise levels greater than 3.

(Tr. 16). Fourth, Quinn is unable to perform any past relevant work. (Tr. 21). Fifth and finally, considering Quinn's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that she can perform. (*Id.*).

Based on this evaluation, ALJ Pickett concluded that Quinn was not disabled, as defined in the Social Security Act, from October 30, 2016 through the date of the decision. (Tr. 22). Quinn appealed ALJ Pickett's decision. (Tr. 220). The Appeals Council declined review. (Tr. 1). At that point, the denial became the final decision of the Commissioner, and Quinn appealed to this Court. (DN 1).

## II. Standard of Review

Administrative Law Judges make determinations as to social security disability by undertaking the five-step sequential evaluation process mandated by the regulations. *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 803-04 (6th Cir. 2008) (citing *Abbott v. Sullivan*, 905 F.2d

918, 923 (6th Cir. 1990)); 20 C.F.R. §§ 404.1520(b), 416.920(b). Throughout this process, the claimant bears the overall burden of establishing that they are disabled; however, the Commissioner bears the burden of establishing the claimant can perform other work existing in significant numbers in the national economy. *Id.* at 804 (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004)).

When reviewing the Administrative Law Judge's decision to deny disability benefits, the Court may "not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (citations omitted). Instead, the Court's review of the Administrative Law Judge's decision is limited to an inquiry as to whether the Administrative Law Judge's findings were supported by substantial evidence, 42 U.S.C. § 405(g); *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001) (citations omitted), and whether the Administrative Law Judge employed the proper legal standards in reaching his conclusion. *See Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986). Substantial evidence exists "when a reasonable mind could accept the evidence as adequate to support the challenged conclusion, even if that evidence could support a decision the other way." *Cotton v. Sullivan*, 2 F.3d 692, 695 (6th Cir. 1993). The Supreme Court has clarified that "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high[.]" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted).

III. <u>Analysis</u>

Quinn makes several challenges to ALJ Pickett's residual functional capacity ("RFC") determination. A claimant's RFC is defined as the "maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs." 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(c). Put otherwise, the RFC is the most a claimant can do

despite their physical and mental limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). An ALJ bases their RFC determination on "all of the relevant medical and other evidence" in the case record. *Id.* (a)(3). This requires the ALJ to evaluate the persuasiveness of the medical opinions in the record and assess the claimant's subjective allegations. 20 C.F.R. §§ 404.1520c, 404.1529(a).

In this case, the new regulations for evaluating medical opinion evidence apply because Quinn filed her applications for disability benefits after March 27, 2017. *See* 20 C.F.R. § 404.1520c. The new regulations specify that an ALJ will not give any specific evidentiary weight to any medical opinion, even the opinions of a claimant's treating physician. *Id.* ALJs now evaluate the "persuasiveness" of medical opinions using five factors: (1) supportability; (2) consistency; (3) relationship to the claimant; (4) specialization; and (5) other factors. *Id.* (c)(1)-(5). Of these factors, supportability and consistency are the most important. *Id.* (a), (b)(2). The regulations, accordingly, require ALJs to explain how they considered the supportability and consistency factors in their determination. *Id.* (b)(2). Comparatively, ALJs "may, but are not required to, explain" their consideration of factors (3)-(5). *Id.*

### A. ALJ Pickett's Analysis of Dr. Lloyd Miller's Opinion

Dr. Lloyd Miller, Quinn's treating physician, offered several opinions in this case. Quinn's assignments of error center on ALJ Pickett's evaluation of Dr. Miller's "General Residual Functional Capacity Questionnaire" from January of 2019. (*See* Tr. 983-90). This questionnaire is a "check-box analysis" that includes some fill-in-the-blank questions. (*Id.*). Relevant to this appeal are Dr. Miller's conclusions that Quinn can stand/walk less than two hours in a workday and can walk "zero" city blocks "without rest or severe pain." (Tr. 985-86); that Quinn's legs should be elevated to ninety degrees with prolonged sitting for 75% of an eight-hour workday (Tr. 987); and that Quinn was incapable of even "low stress" jobs (Tr. 985).

5

Quinn first argues that ALJ Pickett mischaracterized the evidence by finding that Dr. Miller's opinion was not persuasive because Quinn has not exhibited "the degree of weakness or immobility that would preclude <u>all</u> walking . . . ." Quinn claims that Dr. Miller never depicted her as being unable to walk a block but rather as needing to rest or being in pain *after* walking less than a block. (DN 21-1, at p. 12). The Commissioner asserts that ALJ Pickett was simply summarizing Dr. Miller's conclusion that Quinn could walk zero blocks without rest or severe pain. (DN 27, at pp. 7-8).

ALJ Pickett mentioned Dr. Miller's limitation that Quinn could walk "zero" blocks but did not include the modifying language of "without rest or severe pain." This discrepancy, however, is harmless. ALJ Pickett also noted Dr. Miller's restriction that Quinn would need to alternate between sitting and standing/walking at will, which clearly reflects Quinn's limited ability to walk, rather than a complete inability. That Quinn can walk some but not a lot is evident from Dr. Miller's opinion and the ALJ's discussion. Even if ALJ Pickett somewhat mischaracterized the evidence by not including the "without rest or severe pain" language, he discussed ample additional reasons for finding Dr. Miller's opinion unpersuasive, as will be discussed in more detail below.

Quinn next challenges ALJ Pickett's statement that there was "no evidence on exam of persistent leg swelling to justify the need to elevate the legs 75% of the day." Quinn claims that she never alleged swelling of her legs and that elevation of her legs is required based on her well-documented neuropathy. (DN 21-1, at p. 13). ALJ Pickett's discussion of swelling, Quinn argues, amounts to him "play[ing] doctor" and improperly inserting his own knowledge into his conclusions. The Commissioner responds that ALJ Pickett appropriately considered swelling and that, regardless, the record fails to support Dr. Miller's restrictive leg-raising limitation due to

neuropathy. (DN 27, at p. 8).

Quinn is correct that an ALJ "must not succumb to the temptation to play doctor and make [his] own independent medical findings." *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009). But ALJ Pickett did not make independent medical findings here. Dr. Miller opined that if Quinn had a sedentary job, she would need to elevate her legs 75% of the eight-hour workday. (Tr. 987). Dr. Miller simply filled in the blank to this question without providing any support for the restriction or reasons why elevation was required. Courts have noted that this type of unsupported evidence is weak, at best. *See Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 474 (6th Cir. 2016) (declining to give weight to "rudimentary indications that lack an accompanying explanation.") (citing *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence . . .")). Rather than playing doctor, it appears ALJ Pickett believed this restriction was related to swelling since there was no indication otherwise in Dr. Miller's opinion.

Regardless, other than Quinn's testimony at the administrative hearing that she raises her legs off and on all day because of her neuropathy, Dr. Miller's extremely restrictive leg-raising limitation is not supported by the evidence in the record. Evidence of neuropathy in Quinn's feet is inconsistent from 2014 to 2018. Sometimes she reported numbness and tingling in her feet (Tr. 728, 819-29, 927-36), and other times she didn't (Tr. 352, 681 (neuropathy also not mentioned in Dr. Miller's objective exam or in his "assessment and plan"), 684, 708, 719 (reported numbness and tingling in hands but no mention of feet)). In December of 2017, a nerve conduction study revealed "demyelinating Median neuropathy at the wrist on both sides, and supportive of mild peripheral neuropathy as well due to diabetes mellitus," but the report did not specifically mention Quinn's feet. (Tr. 728). Similarly, from June of 2018 to November of 2018, Dr. Carl Kihm, a

7

podiatrist, treated Quinn's various foot impairments by providing diabetic foot education and instructing her to wear custom orthotics and inspect her feet daily. (Tr. 819-29, 927-36). Dr. Kihm did not instruct Quinn to elevate her legs daily. A different podiatrist in December of 2014 likewise did not suggest leg raising to assist with Quinn's numbness and tingling but recommended she use custom orthotics to reduce stress and strain. (Tr. 355). Based on this evidence, ALJ Pickett did not err in discounting Dr. Miller's leg-elevation restriction.

Quinn further disagrees with ALJ Pickett discounting Dr. Miller's opinion regarding her mental functioning as "beyond Dr. Miller's expertise" and restriction from even "low-stress" jobs because it does not "define what particular stressors Quinn would have to avoid." (DN 21-1, at p. 14). Quinn posits that Dr. Miller not being a mental health specialist should not reduce his opinion's persuasiveness, especially considering that Dr. Miller was privy to her neuro-psych records and listed those records in his opinion. (*Id.*). Quinn also claims that the phrase "low-stress" work is not impermissibly vague because the regulations use this language. (*Id.* at pp. 14-15).

First, Dr. Miller is not a psychiatrist, psychologist, or other mental health specialist; he is a primary-care physician. Specialization is one of the factors to be considered in assigning weight to a physician's opinion. The regulations provide that medical opinions from specialists relating to their area of expertise "may be more persuasive" than medical opinions from sources who are not certified in the relevant area of specialty. 20 C.F.R. § 404.1520c(c)(4). It was therefore not error for ALJ Pickett to weigh, as part of his comprehensive analysis, Quinn's treating source's lack of specialization. *See, e.g., Boozer v. Comm'r of Soc. Sec.*, No. 3:16-cv-806, 2017 WL 9476854, at *10 (N.D. Ohio Apr. 27, 2017) (citing *Hankins v. Comm'r of Soc. Sec.*, No. 2:14-CV-68, 2015 WL 770311, at *11 (S.D. Ohio Feb. 23, 2015) (finding it was appropriate for the ALJ to discount the primary care physician's opinion, in part, because he was not a mental health

8

specialist)).[2]

The Court further finds no error in ALJ Pickett discounting Dr. Miller's opinion that Quinn is "incapable of even 'low-stress' jobs." ALJ Pickett does not state that "low-stress" work, as a category, is impermissibly vague, like Quinn accuses. Rather, ALJ Pickett found this limitation was not persuasive because Dr. Miller failed to support it with any stressors specific to Quinn. Although Dr. Miller included several notes following his restriction, including that Quinn has "severe anxiety," has severe bipolar disorder, depression, and PTSD, and is "not capable of handling mild-moderate stress in office," he does not explain how these conditions make her "incapable of even 'low-stress' jobs." (Tr. 985). In making this observation, ALJ Pickett was weighing the supportability of Dr. Miller's opinion, as is required by the regulations. *See* 20 C.F.R. § 404.1520c(b)(2).

Quinn briefly argues that even if ALJ Pickett properly discounted certain of Dr. Miller's limitations, ALJ Pickett failed to explain why the remainder of Dr. Miller's opinion was not consistent or unsupported by the record. (DN 21-1, at pp. 13-14). But ALJ Pickett was not obligated to discuss each and every limitation proposed in Dr. Miller's opinion. *See, e.g., Reusel v. Comm'r of Soc. Sec.*, No. 5:20-cv-1291, 2021 WL 1697919, at *8 (N.D. Ohio Apr. 29, 2021). The regulations only require that an ALJ's explanation be sufficient for the court to "trace the path of his reasoning." *Stacy v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011); *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 643 (6th Cir. 2013). While ALJ Pickett's explanation for finding Dr. Miller's opinion unpersuasive was not perfect, it was sufficient for the Court to track his reasoning. ALJ Pickett's determination complied with the new regulations in that he discussed

---

[2] Although these cases involved claims before the new regulations became effective, the Court finds they remain persuasive because the substance of the "specialization" factor was not altered by the new amendments, *cf.* 20 C.F.R. § 404.1520c(c)(4) *with* 20 C.F.R. § 404.1527(c)(5), and because they do not specifically apply to the now defunct treating physician rule or "good reasons" requirement.

9

both the opinion's consistency (i.e., that there was no evidence to justify his restrictions) and supportability (i.e., that the opinion is conclusory and does not provide support for his restrictions). And a reasonable mind could accept the evidence as adequate to support ALJ Pickett's assignment of weight.

### B. ALJ Pickett's Mental RFC Determination

Quinn lastly claims that ALJ Pickett's mental RFC determination is not supported by substantial evidence because he relied only on dated state agency consultant opinions. (DN 21-1, at pp. 15-16). Quinn emphasizes that much of her mental health treatment occurred after the state agency consultant's review. Because there were no "legitimate opinions" on Quinn's mental limitations in the record, Quinn argues that ALJ Pickett should have recontacted her treating physician, ordered a consultative examination, or had a medical expert testify at the administrative hearing to ensure the record was completely developed. (*Id.* at pp. 16-17).

The Commissioner responds that it is not error for an ALJ to rely on a non-examining doctor's opinion so long as the ALJ weighs each opinion in the record in formulating his RFC. (DN 27, at p. 10). As to the state agency opinions being allegedly dated, the Commissioner asserts that Quinn has not pointed to any later evidence that would have altered the state agency opinions or the opinion of ALJ Pickett had it been considered. (*Id.* at p. 11).

In the Sixth Circuit, the ALJ may rely on a consulting physician's opinion who did not have the opportunity to review later-submitted medical records so long as there is "some indication" that the ALJ at least considered the fact that relevant evidence postdated the opinion. *See Spicer v. Comm'r of Soc. Sec.*, 651 F. App'x 491, 493-94 (6th Cir. 2016); *see also Andrews v. Comm'r of Soc. Sec.*, No. 5:20-cv-1512, 2021 WL 3375538, at *20 (N.D. Ohio July 14, 2021) (applying *Spicer* to find ALJ's reliance on state agency physicians that did not have full record

before them was appropriate); *see also Kelly v. Comm'r of Soc. Sec.*, 314 F. App'x 827, 831 (6th Cir. 2009) (stating that "[t]here will always be a gap between the time the agency experts review the record and . . . the time the hearing decision is issued. Absent a clear showing that the new evidence renders the prior opinion untenable, the mere fact that a gap exists does not warrant the expense and delay of a judicial remand."). ALJ Pickett discussed Quinn's medical records through January of 2019 (Tr. 19 (citing Ex. 16F)) and the opinion evidence as to Quinn's mental impairments through October of 2017, and indicated he based his RFC determination on "careful consideration of the entire record" (Tr. 16). This suffices as "some indication" that ALJ Pickett considered Quinn's post-opinion evidence before finding the state agency physician's mental RFC findings persuasive.

ALJ Pickett was not required to supplement the record under these circumstances. It is the claimant's burden to prove she is disabled by providing a complete record throughout the administrative review process. *See Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986); *see also* 20 C.F.R. § 416.912(a). While an ALJ has "a duty to develop the record," *Cox v. Comm'r of Soc. Sec.*, 615 F. App'x 254, 262 (6th Cir. 2015), he also "has discretion to determine whether additional evidence is necessary." *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010) (citing *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001)). Where the record is insufficient to support a disability determination, an ALJ may recontact medical sources, request additional existing medical records, ask the claimant to undergo a consultative examination, or ask the claimant or others for more information. 20 C.F.R. § 416.920b(c)(i)-(iv).

Quinn claims that an updated medical opinion was required because her home was invaded in 2018, which precipitated a decline in her mental instability. (DN 21-1, at pp. 15-16). She points to evidence of this traumatic incident causing paranoia, intrusive thoughts, and increased anxiety

when leaving the house. (*Id.* (citing Tr. 827, 861, 967)). However, ALJ Pickett referenced the home invasion in fashioning Quinn's RFC. He noted Quinn's testimony that she suffered from PTSD after the home invasion and, as a result, is scared by loud noises. (Tr. 18). Later, ALJ Pickett found she cannot work with the public and limited her exposure to noise levels. (Tr. 19). Critically, after finding the state agency psychologists' opinions to be persuasive, ALJ Pickett noted that "the DDS opinions appear to appropriately account for her signs and symptoms noted in the longitudinal record above." (Tr. 20). Because ALJ Pickett was provided sufficient medical evidence to determine Quinn's RFC, he acted appropriately, within his discretion under the regulations, in not supplementing the mental opinion evidence.

## IV. Order

**IT IS HEREBY ORDERED** that the final decision of the Commissioner is **AFFIRMED.**

This is a final and appealable Order and there is no just cause for delay.

Regina S. Edwards, Magistrate Judge
United States District Court

August 12, 2021

Copies:    Counsel of Record